UNITED STATES DISTRICT COURT
NORTHERN DISTRICT NEW YORK
_____

TIMOTHY JAMES FLINT,

                              Plaintiff,

                                                    Civil Action: 7:09-CV-1033
v.                                                  (GTS/TWD)

JAMES T. BEZIO,

                              Defendant.

_____

APPEARANCES:                                        OF COUNSEL:

LAW OFFICES OF ELMER ROBERT KEACH, III, PC          ELMER ROBERT KEACH, ESQ.
   Counsel for Plaintiff                            SARMILI SAHA, ESQ.
1040 Riverfront Center
P.O. Box 70
Amsterdam, NY 12010

HON. ERIC T. SCHNEIDERMAN                            BRUCE J. BOIVIN
Attorney General for the State of New York           Assistant Attorney General
   Counsel for Defendant
The Capitol
Albany, New York

GLENN T. SUDDABY, United States District Judge

<u>**DECISION and ORDER**</u>

Currently before the Court, in this civil rights action by former New York State

Corrections Officer Timothy James Flint ("Plaintiff") against New York State Corrections

Investigator James T. Bezio ("Defendant") asserting claims of false arrest and malicious

prosecution arising from criminal charges against Plaintiff following a drug smuggling

investigation at a New York State correctional facility, is Defendant's motion for summary

judgment.  (Dkt. No. 53.)  For the reasons set forth below, Defendant's motion is granted.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Claims

Generally, in his Complaint, Plaintiff alleges as follows, in pertinent part.  During a criminal investigation of New York State Corrections Officer Michael Bradish regarding the smuggling of drugs into Bare Hill Correctional Facility ("Bare Hill C.F.") in the summer of 2006, Plaintiff had told Bradish that he had heard his name "up front" (meaning the watch commander's office).  (Dkt. No. 1.)  As a result, Defendant filed against Plaintiff two misdemeanor charges of Official Misconduct and Obstruction of Governmental Administration, which resulted in Plaintiff's arrest, suspension without pay, and prosecution.  (*Id*.)  One of the charges was dismissed before trial; and Plaintiff was acquitted of the other charge at trial.  (*Id*.)

Based on these allegations, Plaintiff asserts the following three claims against Defendants: (1) a false arrest claim against Defendant under the Fourth Amendment; (2) a malicious prosecution claim against Defendant under the Fourth Amendment; and (3) a substantive due process claim against Defendant under the Fourteenth Amendment.  (*Id*.)

Familiarity with the particular nature of these claims, and the factual allegations supporting them, is assumed in this Decision and Order, which is intended primarily for the review of the parties.

### B.      Parties' Arguments on Defendant's Motion

Generally, in his motion for summary judgment, Defendant asserts the following four arguments: (1) Plaintiff's Fourteenth Amendment substantive due process claim must be dismissed because, where (as here) a particular Amendment (such as the Fourth Amendment) provides an explicit textual source of constitutional protection against a particular source of

government behavior, that Amendment, not the more generalized notion of "substantive due process" must be the guide for analyzing that claim; (2) Plaintiff's Fourth Amendment claim of false arrest must be dismissed because Plaintiff cannot prove the first and fourth elements of that claim (i.e., an intent to confine the plaintiff, and the lack of a privilege regarding that confinement); (3) Plaintiff's Fourth Amendment claim of malicious prosecution must be dismissed because Plaintiff cannot prove the first, third and fourth elements of that claim (i.e., an initiation or continuation of a criminal proceeding against the plaintiff, a lack of probable cause for commencing the proceeding, and actual malice as a motivation for the defendant's actions); and (4) in any event, based on the current record, Defendant is protected from liability as a matter of law by the doctrine of qualified immunity. (Dkt. No. 53, Attach. 8.)

Generally, in his opposition to Defendant's motion, Plaintiff asserts the following three arguments: (1) Defendant is not entitled to summary judgment regarding Plaintiff's Fourth Amendment claim of false arrest because (a) Defendant was sufficiently implicated in Plaintiff's arrest (in that he filed charging documents and directed that Plaintiff be arrested), and (b) Defendant lacked probable cause to arrest Plaintiff (in that the allegations against Plaintiff do not satisfy the requirements for criminal conduct under New York State law); (2) Defendant is not entitled to summary judgment regarding Plaintiff's Fourth Amendment claim of malicious prosecution because (a) Defendant was sufficiently involved in the initiation or continuation of a criminal proceeding against Plaintiff (in that Defendant provided false information to the prosecutor), (b) Defendant lacked probable cause to arrest Plaintiff (for the same reasons as set forth above), and (c) Defendant's actions clearly demonstrated malice (in that he interfered in plea negotiations, misled prosecutors and other law enforcement personnel, threatened witnesses,

and tried to financially harm Plaintiff's lawyer after Plaintiff was acquitted); and (3) based on the current record, a genuine dispute of material fact exists regarding whether Defendant is protected from liability by the doctrine of qualified immunity, because admissible record evidence exists establishing that (a) Defendant lacked probable cause to arrest Plaintiff and (b) a reasonable officer would have recognized that fact. (Dkt. No. 67.)

Generally, in his reply, Defendant asserts the following four arguments: (1) Plaintiff's Fourteenth Amendment substantive due process claim must be dismissed because Plaintiff has conceded the truth of Defendant's argument for the dismissal of that claim; (2) with regard to Plaintiff's Fourth Amendment claim of false arrest, Plaintiff incorrectly argues that the sole piece of evidence supporting Defendant's finding of probable cause (i.e., a written statement of former Correctional Officer Michael Bradish) was the subject of both coercion before drafting and recantation at trial; (3) Plaintiff's arguments regarding his Fourth Amendment claim of malicious prosecution are unconvincing, because (a) Defendant possessed probable cause to arrest Plaintiff (for the same reasons as set forth above), and (b) the examples of malice cited Plaintiff are either unsupported by the record or legally immaterial; and (4) due to the brief and superficial nature of Plaintiff's argument regarding qualified immunity, he has effectively conceded the truth of Defendant's argument regarding qualified immunity. (Dkt. No. 70.)

## C.    Undisputed Material Facts

Unless followed by record citations, the following facts were asserted and supported by Defendant and either expressly admitted by Plaintiff or denied by Plaintiff without an accurate supporting record citation, constituting an effective admission pursuant to Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court. (*Compare* Dkt. No. 53, Attach. 1 *with* Dkt. No.

65.)[1]

### 1.    Investigation of C.O. Bradish

1. In June 2006, an investigation was opened by the DOCS Inspector General ("IG") to look into allegations that a Correction Officer ("C.O.") by the name of Michael Bradish was smuggling marijuana into Bare Hill C.F.

2. This became a rather involved investigation that ultimately implicated several COs, private citizens, and inmates in various crimes and acts of misconduct. Plaintiff's conduct was only one aspect of the investigation and the investigation continued for some time after Plaintiff was charged.

3. Specifically, the IG's Office received information from Captain Ronald Foster, who worked at Bare Hill C.F., that two separate inmates alleged, during independent disciplinary hearings, that a C.O. Bradish was involved in smuggling marijuana into Bare Hill C.F. which he provided to inmates, who then sold the marijuana to other inmates.

4. Between June 28, 2006, and August 2006, Defendant interviewed several inmates at Bare Hill C.F., and performed surveillance on C.O. Bradish's residence.

5. Ultimately, information was developed which revealed that C.O. Bradish's smuggling scheme involved a friend of Bradish's named Scott Monroe.

---

[1]    The Court notes that, among his opposition papers, Plaintiff has filed, "pursuant to the Local Rules of Court," a "Counter-Statement of Material Fact." (Dkt. No. 66, at 1.) The only local rule on the subject permits a statement of "additional material facts that the non-movant contends are in dispute." N.D.N.Y. 7.1(a)(3). To the extent Plaintiff has attempted that statement to be one of *undisputed* material facts, the Court rejects that attempt (which would be appropriate only if Plaintiff had cross-moved for summary judgment, which he did not). Rather, the Court has carefully considered the statement in determining what material facts asserted by Defendant have successfully been disputed (and what additional factual disputes are material to Defendant's motion).

6. More specifically, it was learned that Mr. Monroe received packages at his Post Office box in Brasher Falls, NY, and took the packages to his home where they were retrieved by C.O. Bradish.

7. With this information, on August 14, 2006, Defendant contacted Postal Inspector Scott Piro, briefed him on the case, and requested his assistance in verifying whether Scott Monroe had a post Office box at the Brasher Falls, NY, Post Office.

8. Inspector Piro confirmed that Mr. Monroe had a post office box and reported that the Post Master advised that he knew that the PO Box received mail from prisons and packages which Mr. Monroe told him he forwarded on.

9. A mail watch was put on deliveries to that post office box.

10. On September 12, 2006, Defendant received information from a confidential informant that a package was expected to be delivered to Mr. Monroe's post office box and relayed this information to Inspector Piro.

11. On September 13, 2006, Inspector Piro called and reported that a package had been received and that the Post Master had told him that Mr. Monroe had informed the Post Master that any new packages should be returned.

12. Defendant determined he had to speed up the investigation, because it appeared that Bradish was shutting down his operation; Bezio felt it was imperative that he move quickly to resolve the investigation with the package. (Dkt. No. 53, Attach. 5, at ¶¶ 22-23 [Bezio Decl.].)[2]

_____

[2]     While Plaintiff denies this factual assertion, he supports that denial with only a citation a portion of the record that is either immaterial to or actually supportive of the factual assertion (having to do with Bradish's *motivation* for shutting down his operation). (Dkt. No. 65, at ¶ 12.)

13. He therefore asked Inspector Piro to call Mr. Monroe and tell him there was a package to be picked up and, if he balked, to come up with a story that would draw Mr. Monroe to the post office.

14. Investigator Piro reported that he called Mr. Monroe who agreed to pick up the package that afternoon.

15. Defendant then traveled to Brasher Falls and, with the assistance of Inspector Piro, conducted a controlled delivery of a package to Mr. Monroe.

16. Mr. Monroe agreed to open the package, in which was found a $100 bill, and 37 glassine packages of heroin secreted in a bottle of Creatine.

17. Mr. Monroe was interviewed, provided a written statement, and agreed to cooperate in the investigation.

18. Mr. Monroe reported that C.O. Bradish had visited him earlier the same day, on September 13, 2006, and they discussed a package that he was expecting.

19. When Mr. Monroe told C.O. Bradish that the package had not arrived, C.O. Bradish told Mr. Monroe that he should send the package back if it came in "because things were hot around the prison."

20. In furtherance of the investigation, Mr. Monroe agreed to make a controlled call to C.O. Bradish to have Bradish pick up the package at Mr. Monroe's home.

21. Defendant then coordinated with Franklin County District Attorney ("D.A.") Derek Champagne and briefed him on the investigation.

22. On September 14, 2006, Defendant met with Inspector Piro and they traveled to Mr. Monroe's home and conducted the controlled call between Mr. Monroe and C.O. Bradish, during which C.O. Bradish agreed to come to Mr. Monroe's home that night to pick up the package.

23. Defendant then met with D.A. Champagne and briefed him on these developments in the case and requested his assistance.

24. D.A. Champagne assigned his two investigators, Michael Fleury and William Ritchie, to assist by setting up video equipment in the Monroe home to record the exchange.

25. Defendant also coordinated with the State Policeand together they developed an operation plan for that evening.

26. The controlled delivery of the package occurred, and C.O. Bradish was arrested.

27. C.O. Bradish was cooperative during the arrest and identified where he had stowed the drugs and the $100 bill.

28. After the arrest, Defendant briefed his supervisor, Deputy Inspector General Vern Fonda.

29. Following DOCS procedure, Defendant called Bare Hill C.F. and reported the arrest of staff to Lieutenant ("Lt.") Louis Noto.

### 2.    Investigation of Plaintiff

30. C.O. Bradish's comment to Mr. Monroe that the prison was "hot," and the direction to send back packages, led Defendant to believe that C.O. Bradish had learned about the investigation and was attempting to shut down his operation.

31. The next day, Defendant met with D.A. Champagne and explained that it appeared that someone had told C.O. Bradish about the investigation, which almost jeopardized the investigation.

32. D.A. Champagne indicated that he would speak with Mr. Bradish's attorney and see if he could arrange for C.O. Bradish to cooperate with the investigation into who had tipped him

off.[3]

33. On September 18, 2006, Defendant received a phone call from Captain Foster of Bare Hill C.F. who informed him that Plaintiff had admitted to him (Captain Foster) that he (Plaintiff) had called C.O. Bradish, and that Plaintiff had signed a statement to the same effect. (Dkt. No. 53, Attach. 5, at ¶ 45 [Bezio Decl.].)[4]

34. Captain Foster also indicated that he had a memorandum from Lt. Noto regarding a conversation he had with C.O. Bradish on September 12, 2006.

35. Captain Foster faxed to Defendant the statement of Plaintiff and memorandum of Lt. Noto.

36. In addition, Captain Foster faxed a memorandum from himself to Superintendent John J. Donelli, dated September 18, 2006, detailing his conversation with Plaintiff. (*Compare* Dkt. No. 53, Attach. 5, at ¶¶ 47, 59-60 & C [Bezio Decl.] *with* Dkt. No. 65, at ¶ 36.)

37. The memorandum from Lt. Noto, dated September 15, 2006, recounted a conversation that Lt. Noto had had with C.O. Bradish on September 12, 2006. More specifically, that memorandum stated as follows, in pertinent part:

---

[3]     After expressly admitting the factual assertion in question, Plaintiff attempts to assert other facts that are immaterial to Defendant's motion and that, in any event, belong in a (separate) Statement of Additional Facts in Dispute, under Local Rule 7.1(a)(3). (Dkt. No. 65, at ¶ 33.)

[4]     After expressly admitting this fact, Plaintiff attempts to assert facts regarding the *substance* of his conversation with C.O. Bradish. (Dkt. No. 65, at ¶ 34.) These facts are immaterial to the factual assertion in question (i.e., that Captain Foster told Defendant that Plaintiff had told Captain Foster that he had called C.O. Bradish), and (again) belong in a separate Statement of Additional Facts in Dispute. Moreover, after expressly admitting that Captain Foster told Defendant that Plaintiff had signed a statement to the same effect, Plaintiff attempts to assert facts regarding whether the statement was made under duress. (*Id.*) These facts also are immaterial to the factual assertion in question (i.e., that Captain Foster told Defendant that Plaintiff had signed a statement), and (again) belong in a separate Statement of Additional Facts in Dispute.

> (a) C.O. Bradish indicated to Lt. Noto that C.O. Bradish had "received 2 phone calls from DOCS employees . . . [who] told him he was under investigation";
>
> (b) while C.O. Bradish would not say who made the calls, he did say that "these calls came from someone higher than that," as he pointed at the Captain's office;
>
> (c) C.O. Bradish specifically mentioned that "Sgt White, one or both[,] were playing 'secret squirrel' games;" and
>
> (d) C.O. Bradish stated that he would be "happy to piss in a cup for anyone if that would satisfy them."

38. The memorandum from Captain Foster described the substance of a conversation he had had with Plaintiff on September 18, 2006. In essence, Captain Foster's memorandum indicated as follows, in pertinent part:

> (a) Plaintiff came to the office and indicated that he had heard a rumor that he (Plaintiff) was being accused of tipping off C.O. Bradish about an ongoing IG investigation;
>
> (b) Plaintiff said "that he was here to fall on the sword" and admit that he had made the call;
>
> (c) Plaintiff said that recently C.O. Bradish had asked him (in person) whether he knew anything about C.O. Bradish being investigated, and Plaintiff had told him that he did not;
>
> (d) Plaintiff said that, while he did not know about the IG investigation, he did subsequently hear C.O. Bradish's name mentioned in the Watch Commander's Office;

(e) Plaintiff said that, as a result, he called C.O. Bradish to tell him that he (Plaintiff) had heard Bradish's name mentioned in the Watch Commander's Office;

(f) when asked by Captain Foster why he called C.O. Bradish, Plaintiff said he called C.O. Bradish for the following reason (as described by Captain Foster): "he has seen in the Department in the past . . . [situations in which] an officer got caught . . . [resulting in other] . . . Correction Officers [having to take a ] piss test . . . [even when they weren't] . . . dirty";

(g) Plaintiff said that he did not think in a thousand years that C.O. Bradish would be dealing drugs to inmates, because it "was a street thing";

(h) when Plaintiff asked Captain Foster whether he (Captain Foster) believed Plaintiff, he (Captain Foster) said he did; and

(i) when again asked by Foster why "as a second level supervisor" he would call C.O. Bradish "when he did know what was going on," Plaintiff said, "I don't know why I called him."[5]

(Dkt. No. 53, Attach. 5, at ¶ 60 & Ex. C [Bezio Decl.]; *cf*. Dkt. No. 61, Attach. 10, at 46, 64, 65 [attaching pages "46," "64," and "65" of Foster Dep. Tr.].)[6]

---

[5]     It is possible that this sentence in the memorandum contains a typographical error, inadvertently omitting the word "not" before the phrase "know what was going on." However, that possibility is immaterial to the probable-cause issue before the Court, because both constructions weigh in favor of a finding of probable cause.

[6]     While Plaintiff denies he told Captain Foster that he came to "fall on the sword" or that dealing drugs to inmates "was a street thing," the record evidence cited by Plaintiff in no way controverts the fact that Foster stated those things in his memorandum, which was subsequently read by Defendant. (Dkt. No. 65, at ¶ 40.) Whether or not the things stated by Captain Foster were true is immaterial to the probable-cause issue raised by Defendant in his motion for summary judgment.

39. The statement of Plaintiff (incorrectly dated October 18, 2006, rather than September 18, 2006) stated as follows, in pertinent part:

(a) during the early 1990s, he used to play softball on a softball team with C.O. Bradish, knew his wife and two children, and considered him a personal friend;

(b) after that time, Plaintiff had not seen C.O. Bradish until he (Plaintiff) transferred to Bare Hill C.F. in August 2004;

(c) after the transfer, Plaintiff would see C.O. Bradish occasionally while working midnights, when Bradish would always talk to him (Plaintiff) and ask about his family;

(d) "[a]pproximately two weeks [before September 18, 2006] I overheard a conversation concerning M Bradish being looked into. No details were given[;] it was simply a statement";

(e) "I called CO Bradish and told him I heard his name but don't know who or why they were looking at him[;] I provided no specifics as I was not aware of any"; and

(f) "I was not aware of the on going investigation of this Officer bringing contraband into this facility. If I was aware of the on going investigation of him bringing drugs into this facility I would certainly not [have] called him nor would I attempt to impede an investigation of this magnitude."

(Dkt. No. 53, Attach. 5, at ¶¶ 61-62 & Ex. D [Bezio Decl.].)[7]

---

[7]     After expressly admitting this fact, Plaintiff attempts to assert facts indicating that the statement was made under duress. (Dkt. No. 65, at ¶ 41.) These facts are immaterial to the probable-cause issue raised by Defendant in his motion. For example, the (asserted) fact that Defendant ordered Deputy Jubert to obtain a written statement from Plaintiff regarding his interactions with C.O. Bradish "as soon as possible" in no way means that Bezio had reason to

40. On or about September 19, 2006, D.A. Champagne arranged for his two investigators from the District Attorney's Narcotics Unit, Investigators Ritchie and Fleury, to interview C.O. Bradish at the Franklin County Jail to seek his cooperation.

41. During that interview, C.O. Bradish made the following statements, in pertinent part:

(a) he admitted bringing in heroin on several occasions;

(b) he identified several people not employed by DOCS who were dealing with drugs in the Brasher Falls, Saranac Lake or St. Lawrence County area;

(c) he named four or five correction officers with whom he had smoked marijuana or he knew had used marijuana;

(d) he stated that this incident was going to be his last involvement in such activity;

(e) he stated that, before the controlled pick up on September 13, 2006, he had received a phone call from Plaintiff, who informed him that his name had been mentioned "up front" at Bare Hill C.F. (meaning in the Bare Hill C.F. administration and/or administration building). (Dkt. No. 53, Attach. 7, at ¶ 17 [Ritchie Decl.]; Dkt. No. 61, Attach. 5, at 18, 38-41, 44-46, 49, 51, 55-58, 63-67, 71-72, 75, 79-80, 102, 106-108, 113, 118, 123-124, 138 [attaching corresponding pages of Bezio Dep. Tr.].);[8] and

doubt the veracity or accuracy of the admissions in that statement. Moreover, (again) these factual assertions belong in a separate Statement of Additional Facts in Dispute.

[8] While Plaintiff attempts to assert facts regarding *why* he called C.O. Bradish and told him that his name had been mentioned "up front" at Bare Hill C.F., those assertions are immaterial to the fact in question (i.e., that C.O. Bradish told Investigator Ritchie that Plaintiff had called him and told him that his name had been mentioned "up front" at Bare Hill C.F.). (Dkt. No. 65, at ¶ 48.) Moreover, (again) these factual assertions belong in a separate Statement of Additional Facts in Dispute.

(f) following the phone call from Plaintiff, C.O. Bradish shut down his smuggling

activities. (Dkt. No. 53, Attach. 7, at ¶¶ 17, 22-23 [Ritchie Decl.]; Dkt. No. 61,

Attach. 6, at 20-21, 54-56 [attaching pages "20" and "21" of Bradish Dep. Tr.].)

42. While a C.O. could be mentioned "up front" for a range of innocuous reasons

(including uniform violations, absenteeism, tardiness, or giving certain inmates special

treatment), he or she could also be mentioned "up front" for a range of serious reasons (including

disciplinary issues, smuggling heroin into the facility, or other criminal acts). (Dkt. No. 61,

Attach. 7, at 34 [attaching page "34" of Champagne Dep. Tr.]; Dkt. No. 61, Attach. 10, at 48, 52,

53 [attaching pages "48," "52" and "53" of Foster Dep. Tr.]; Dkt. No. 61, Attach. 6, at 51-52

[attaching pages "51" and "52" of Bradish Dep. Tr.].)

43. While it was not improper (under DOCS policy) for a lieutenant to call a C.O. and

mention that the C.O.'s name had been mentioned "up front" and to inquire about the C.O.'s

well being, it was unusual for that to happen. (Dkt. No. 61, Attach. 10, at 53 [attaching page

"53" of Foster Dep. Tr.].)

44. Investigator Ritchie briefed D.A. Champagne about the results of the interview, and

D.A. Champagne asked that the statement be reduced to writing.

---

It is important to note that Defendant has adduced evidence that, during this interview, C.O. Bradish also stated that he had previously asked Plaintiff to give him a "heads up" if he ever heard his name mentioned "up front." (Dkt. No. 53, Attach. 7, at ¶¶ 17, 22-23 [Ritchie Decl.].) Plaintiff has adduced admissible record evidence controverting these facts (although he has not controverted that the cessation of his smuggling operation temporally followed the phone call from Plaintiff). (Dkt. No. 65, at ¶ 47.) If sufficient evidence existed that Investigator Ritchie had communicated these facts to Defendant, then whether or not they were true would be immaterial to the probable-cause issue raised by Defendant in his motion. However, the Court has not found such evidence. (Cf. Dkt. No. 53, Attach. 7, at ¶¶ 17-19 [Ritchie Decl., stating merely that, on Sept, 20, 2006, Bezio joined Ritchie for a second interview of Flint, the purpose of which was to "clarify what [Flint] said at the earlier interview"].)

45. On or about September 19, 2006, Defendant was informed by his contact at the District Attorney's Office that C.O. Bradish had been interviewed and was cooperating with the investigation was invited to join Investigators Ritchie and Fleury to interview C.O. Bradish at the Franklin County Jail on September 20, 2006, to get a written statement.

46. During Defendant's interview with C.O. Bradish on September 20, 2006, C.O. Bradish provided the names of four correction officers with whom he had smoked marijuana.

47. In addition, C.O. Bradish indicated as follows, in pertinent part:

> (a) he had been bringing Creatine into the facility for about six months for inmate Cesar Mastropietro;
>
> (b) the last two times, he (C.O. Bradish) knew the Creatine had drugs in it;
>
> (c) he knew it was wrong;
>
> (d) because he was afraid he would get caught, about four months previously, he asked Plaintiff to let him (C.O. Bradish) know if Plaintiff heard his name "up front" at Bare Hill C.F.;
>
> (e) Plaintiff agreed to do so; and
>
> (f) on (what he thought was) September 10, 2006, Plaintiff called C.O. Bradish at his home and told C.O. Bradish that Plaintiff had heard his name up front.

(Dkt. No. 53, Attach. 5, at ¶ 66 [Bezio Decl.]; Dkt. No. 53, Attach. 7, at ¶¶ 21-23 [Ritchie Decl.]; Dkt. No. 53, Attach. 5, at 25 [attaching Supporting Deposition of C.O. Bradish, dated Sept. 20, 2006].)[9]

---

[9] After admitting that C.O. Bradish made these statements during the interview, Plaintiff attempts to take issue with (1) whether C.O. Bradish felt pressure to cooperate in the case against Plaintiff based on the criminal charges he (C.O. Bradish) was facing, and (2) whether the date of the phone call was actually September 4, 2006. (Dkt. No. 65, at ¶ 53.) However, such issues are immaterial to the probable-cause issue raised by Defendant in his

48. This information was reduced to writing in a signed statement using a "Supporting Deposition" form (Genl-4).

49. During the interview, Defendant asked C.O. Bradish questions and recorded C.O. Bradish's answers in writing on the form as C.O. Bradish gave those answers. (Dkt. No. 53, Attach. 5, at ¶ 70 [Bezio Decl.]; Dkt. No. 53, Attach. 5, at ¶¶ 20, 24 [Ritchie Decl.]; Dkt. No. 53, Attach. 3, at 22 [attaching page "67" of Bradish Dep. Tr.].)[10]

50. When the questioning was completed, Defendant gave the form to C.O. Bradish to read and asked if it was correct. (Dkt. No. 53, Attach. 5, at ¶ 71 [Bezio Decl.]; Dkt. No. 53, Attach. 5, at ¶ 26 [Ritchie Decl.]; Dkt. No. 53, Attach. 3, at 23 [attaching page "68" of Bradish Dep. Tr.].)[11]

_____

motion (which has to do with, in part, what C.O. Bradish stated to Defendant during the second interview). Moreover, (again) these factual assertions belong in a separate Statement of Additional Facts in Dispute.

With regard to whether Plaintiff also said "be careful" (or "heads up," as indicated in one portion of Investigator Ritchie's written notes from that interview) to C.O. Bradish during the phone call, the deposition of C.O. Bradish does not directly controvert that fact, but merely asserts a lack of certainty with regard to it. (Dkt. No. 61, Attach. 6, at 10-11, 13, 21-22, 56-57 [attaching corresponding pages of Bradish Dep. Tr.].) However, the Court finds that C.O. Bradish's arbitration hearing transcript sufficiently controverts the fact. (Dkt. No. 64, Attach. 12, at 4, 17 [attaching pages "300" and "313" of Bradish Arbit. Hrg. Tr.].)

[10]     After admitting that Defendant hand wrote the statement, Plaintiff attempts to assert that, because C.O. Bradish later testified that Defendant had "suggested" the facts to him, he later recanted "many" of the facts. (Dkt. No. 65, at ¶ 55.) Plaintiff fails to provide a specific record citation in support of the purported recantation, or even to identify which facts were recanted. (*Id*.) Moreover, any subsequent recantation by C.O. Bradish is immaterial to the fact that, during the second interview, questions were asked by Defendant (whether or not in a leading fashion, based on Defendant's understanding of the facts), answers were given by C.O. Bradish, and the statement was edited and signed by C.O. Bradish. Finally, (again) these factual assertions belong in a separate Statement of Additional Facts in Dispute.

[11]     After expressly admitting this fact, Plaintiff asserts that "Bradish is unsure if he actually read the statement." (Dkt. No. 65, at ¶ 56.) In support of that assertion, Plaintiff cites his own deposition transcript, in which he stated, "If I [read the statement before I signed it], I can't recall." (Dkt. No. 61, Attach. 6, at 29 [attaching page "29" of Bradish Dep. Tr.].) For the

51. C.O. Bradish made one correction, which he initialed.

52. C.O. Bradish then signed the statement, Investigator Ritchie signed the statement as a witness, and Defendant signed as the person taking the deposition.

53. Defendant then went through the same process with regard to a "Supporting Deposition" (Genl-4 form) related to the information provided by C.O. Bradish about the other correction officers with whom he used marijuana.

### 3. Arrest and Prosecution of Plaintiff

54. D.A. Champagne was briefed about the results of both the first and second interviews. (Dkt. No. 53, Attach. 5, at ¶ 18 [Ritchie Decl.]; Dkt. No. 53, Attach. 5, at ¶ 80 [Bezio Decl.]; Dkt. No. 53, Attach. 4, at ¶¶ 15-17 [Champagne Decl.]; Dkt. No. 61, Attach. 7, at 9-11 [attaching pages "9," "10" and "11" of Champagne Dep. Tr.].)[12]

55. Shortly thereafter, D.A. Champagne authorized Defendant to arrest Plaintiff and charge him with Official Misconduct and Obstruction of Governmental Administration. (Dkt. No. 53, Attach. 5, at ¶ 81 [Bezio Decl.]; Dkt. No. 53, Attach. 4, at ¶¶ 18-23 [Champagne

---

sake of brevity, the Court will set aside (1) the lack of personal knowledge in support of this denial, and (2) the question of how C.O. Bradish could have possibly requested and initialed an edit to the statement without reading it. More important is the fact that the issue that Plaintiff attempts to raise is immaterial to the fact asserted (which merely states that Defendant gave the form to C.O. Bradish to read and asked if it was correct). Moreover, (again) this assertion belongs in a separate Statement of Additional Facts in Dispute.

[12]     In his implicit partial denial of this fact, Plaintiff asserts that "the results" of the second interview included a representation by Defendant to D.A. Champagne that "it was uncontested" that Plaintiff knew of the investigation at the time of the phone call to C.O. Bradish. (Dkt. No. 65, at ¶ 61.) However, in support of that assertion, Plaintiff cites record evidence that, at most, merely indicates that Defendant reported his conclusion or inference that Plaintiff possessed such intent. (*Id.*) Furthermore, even if Defendant passed off his conclusion or inference based as an uncontested fact, such an action would be immaterial to the probable-cause issue, given the facts known to Defendant at the time of arrest (as summarized below in Part III.B. of this Decision and Order). Finally, (again) this assertion belongs in a separate Statement of Additional Facts in Dispute.

Decl.].)[13]

56. On September 20, 2006, Defendant typed up the criminal informations and coordinated with NY State Police Investigator Joseph Tatro to effect the arrest.

57. On September 26, 2006, Plaintiff came to the State Police Station in Malone, NY, with his attorney and was arrested by State Police Investigator Tatro.

58. The prosecution of Plaintiff was assigned to Assistant District Attorney ("A.D.A.") John Delehanty.

59. The final decision to charge and ultimately prosecute Plaintiff was that of the District Attorney, and was based (in part or perhaps in its entirety) on information told to him by Investigator Ritchie and/or Defendant, which included discussions of "exactly" what was in C.O. Bradish's Supporting Deposition. (Dkt. No. 53, Attach. 6, at ¶ 33 [Delehanty Decl.]; Dkt. No. 53, Attach. 4, at ¶ 29 [Champagne Decl.]; Dkt. No. 61, Attach. 7, at 21, 23, 45-46, 80 [attaching pages "21," "23," "45," "46," and "80" of Champagne Dep. Tr.].)[14]

---

[13] After expressly admitting this fact, Plaintiff attempts to assert a fact regarding the *basis* on which D.A. Champagne made his decision to charge Plaintiff. (Dkt. No. 65, at ¶ 62.) That purported basis is immaterial to the fact asserted (i.e., that, shortly thereafter, D.A. Champagne authorized Defendant to arrest Plaintiff). Moreover, (again) this factual assertion belongs in a separate Statement of Additional Facts in Dispute.

[14] In his implicit partial denial of this fact, Plaintiff attempts to assert that, in his deposition, D.A. Champagne admitted that (1) he could not find a document expressly "say[ing] [that Plaintiff] knew there was an investigation into Mr. Bradish's conduct in bringing heroin into the facility," when Plaintiff made the phone call to C.O. Bradish, and (2) without evidence of intent, Plaintiff could not be found guilty at trial of the crimes charged. (Dkt. No. 65, at ¶ 66.) However, these facts are immaterial to (1) whether an inference of intent existed based on the other facts known to Defendant at the time of arrest (as summarized below in Part III.B. of this Decision and Order), and (2) whether probable cause existed to arrest and charge Plaintiff. Moreover, (again) these factual assertions belong in a separate Statement of Additional Facts in Dispute.

60. Before trial A.D.A. Delehanty dismissed the Official Misconduct charge against Plaintiff; and at trial a jury acquitted Plaintiff of the Obstructing Governmental Administration charge. (Dkt. No. 53, Attach. 6, at ¶¶ 22-27 [Delehanty Decl.].)[15]

## II.   GOVERNING LEGAL STANDARDS

### A.   Legal Standard Governing a Motion for Summary Judgment

For the sake of brevity, the Court will not recite the well-known legal standard governing a motion for summary judgment, but will merely refer the reader to the Court's decision in *Pitts v. Onondaga County Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B.   Legal Standards Governing Plaintiff's Claims Against Defendant

In their memoranda of law, the parties have demonstrated an accurate understanding of the legal standards governing Plaintiff's claims against Defendant.  (Dkt. No. 53, Attach. 8; Dkt. No. 67; Dkt. No. 70.)  As a result, the Court will not repeat those legal standards in this Decision and Order, which (again) is intended primarily for the review of the parties.

## III.   ANALYSIS

### A.   Plaintiff's Substantive Due Process Claim Against Defendant

In his opposition memorandum of law, Plaintiff did not address Defendant's argument for

---

[15]    After expressly admitting this fact, Plaintiff attempts to assert facts regarding (1) why A.D.A Delehanty dismissed the Official Misconduct charge, and (2) how long the jury deliberated before acquitting Plaintiff on the Obstruction of Governmental Administration charge.  (Dkt. No. 65, at ¶ 67.)  Both of these facts are immaterial to the fact asserted (i.e., that before trial A.D.A. Delehanty dismissed the Official Misconduct charge against Plaintiff, and that at trial a jury acquitted Plaintiff of the Obstructing Governmental Administration charge). The Court notes that whether A.D.A. Delehanty and/or a jury ultimately concluded that insufficient evidence of intent existed to convict Plaintiff is immaterial to whether probable cause existed to arrest and charge him.  Moreover, (again) these factual assertions belong in a separate Statement of Additional Facts in Dispute.

the dismissal of Plaintiff's substantive due process claim. (Dkt. No. 67.) In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D .N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n. 1 (N.D.N.Y. Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n. 3 (N.D.N.Y. Aug .7, 2009) (Suddaby, J.) (collecting cases). Here, at the very least, Defendant has met the lightened burden that was created by Plaintiff's failure to respond. For this reason, Plaintiff's substantive due process claim against Defendant is dismissed.

### B. Plaintiff's False Arrest Claim Against Defendant

After carefully considering the matter, the Court finds that, based on the current record, it is undisputed that, on September 20, 2006, probable cause existed to arrest Plaintiff for Official Misconduct under N.Y. Penal Law § 195.00(1), and/or Obstructing Governmental Administration under N.Y. Penal Law § 195.05. The Court reaches this conclusion for the reasons stated in Defendant's memoranda of law. (Dkt. No. 53, Attach. 8; Dkt. No. 70.) The Court would add only the following three points.

First, with regard to Plaintiff's argument that there was insufficient evidence of an "intent to obtain a benefit" to arrest Plaintiff for Official Misconduct under N.Y. Penal Law § 195.00(1), Defendant testified that, among other things, he believed that Plaintiff intended to benefit by "maintain[ing] his friend[ship]" with Plaintiff. (Dkt. No. 61, Attach. 5, at 68 [attaching page

"68" of Bezio Dep. Tr.].)  It is undisputed that, at that point in time, Plaintiff's long-standing friendship with C.O. Bradish offered Plaintiff the ability to occasionally talk with C.O. Bradish about Plaintiff's family.  *See, supra,* Part I.C. of this Decision and Order.  Under the circumstances, the Court finds that probable cause existed for Defendant to believe that Plaintiff possessed an "intent to obtain a benefit" under N.Y. Penal Law § 195.00(1).  *See People v. Feerick*, 93 N.Y.2d 433, 449 (N.Y. 1999) (finding that police officers' intent to retrieve a police radio constituted an "intent to obtain a benefit" under N.Y. Penal Law § 195.00[1], because the radio's "loss could have subjected defendants to scorn [or] ridicule . . .").

Second, with regard to Plaintiff's argument that there was insufficient evidence of "physical force or interference" to arrest him for Obstructing Government Administration under N.Y. Penal Law § 195.05, Plaintiff is correct that mere words alone do not constitute such "physical force or interference."  *New York v. Case*, 42 N.Y.2d. 98, 102 (N.Y. 1977).  However, words that are directed at a "known criminal activity" and that cause by a "physical reaction" may constitute such  "physical force or interference."  *Matter of Davan L.*, 91 N.Y.2d 88, 91-92 (N.Y. 1997).  Here, probable cause existed to believe that Plaintiff's words were directed at a known criminal investigation, and that they caused C.O. Bradish to abruptly cease that operation.

Third, with regard to Plaintiff's argument that there was insufficient evidence of knowledge to arrest him for either  Official Misconduct or Obstructing Government Administration, Plaintiff is correct that, for his arrest to have been privileged with regard to either charge, probable cause must have existed that, inter alia, he *knew* of the IG investigation of C.O. Bradish when he made the phone call.  *See* N.Y. Penal Law § 195.00(1) ("A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit[,] . . . [h]e commits an act relating to his office but constituting an

unauthorized exercise of his official functions, knowing that such act is unauthorized . . . ."); N.Y. Penal Law § 195.05 ("A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . . .").

However, it is also true that "[w]hether probable cause exits depends upon the reasonable conclusions to be drawn from the facts known to the arresting officer at the time of arrest." *Davenpeck v. Alford*, 125 S. Ct. 588, 593 (2004). In addition, "[o]nce a police officer has obtained a reasonable basis for believing there is probable cause to make an arrest, he is not required to explore and eliminate every theoretically plausible claim of innocense before making an arrest." *Ricciuti v. NYC Transit Auth.*, 124 F.3d 124, 128 (2d Cir. 1997). As a result, it is "of no consequence that a more thorough or more probing investigation might have cast doubt upon" the arrestee's culpability. *United States v. Manley*, 632 F.2d 978, 984 (2d Cir. 1980), *cert. denied*, 449 U.S. 1112 (1981).

Here, for the sake of brevity, the Court will not linger on the fact that (1) the decision to arrest Plaintiff was vetted, if not made, by D.A. Champagne, and (2) the arrest was effected by Investigator Tatro. Even if Defendant could be fairly characterized as having been the driving force behind the arrest of Plaintiff, it is undisputed that the following facts were known to Defendant at the time of arrest: (1) the phone call between Plaintiff and C.O. Bradish was reported to have occurred on September 10, three days before the controlled pick up on September 13; (2) in the phone call, Plaintiff (a lieutenant) told C.O. Bradish (a correctional officer) that Bradish's name had recently been mentioned "up front" at Bare Hill C.F. (meaning

in the administration and/or administration building); (3) three days after the reported date of the phone call, C.O. Bradish abruptly terminated a package pick up; (4) five days after the termination of the package pick up, Plaintiff told Captain Foster that he had come to "fall on the sword" and that he had called C.O. Bradish; (5) at that time, Plaintiff also told Captain Foster that the reason he had called C.O. Bradish was that "he has seen in the Department in the past . . . [situations in which] an officer got caught . . . [resulting in other] . . . Correction Officers [having to take a ] piss test . . . [even when they weren't] . . . dirty"; (6) when pressed about why he had called C.O. Bradish under the circumstances, Plaintiff said, "I don't know why I called him"; (7) Plaintiff admitted having a long-standing friendship with C.O. Bradish; and (8) after his arrest, C.O. Bradish told Lt. Noto that he had "received 2 phone calls from DOCS employees . . . [who] told him he was under investigation." *See, supra,* Part I.C. of this Decision and Order.

Based on these facts, the Court finds that Defendant could have reasonably inferred that Plaintiff knew of the investigation when he made the phone call. The fact that another officer may have reached a different conclusion by crediting Plaintiff's claim of lack of knowledge, or investigating another correctional employee for tipping off C.O. Bradish, does not vitiate the existence of probable cause. *See Nelson v. Hernandez*, 524 F. Supp.2d 212, 221 (E.D.N.Y.2007) (rejecting the argument that defendant's failure to investigate plaintiff's alibi negated probable cause).

For all of these reasons, Plaintiff's false arrest claim against Defendant is dismissed.

### C. Plaintiff's Malicious Prosecution Claim Against Defendant

For the same reasons that the Court finds that probable cause existed to arrest Plaintiff for Official Misconduct under N.Y. Penal Law § 195.00(1), and/or Obstructing Governmental Administration under N.Y. Penal Law § 195.05, the Court finds that probable cause existed to

prosecute Plaintiff for those offenses.   Again, the Court reaches this conclusion for the reasons stated in Defendant's memoranda of law.  (Dkt. No. 53, Attach. 8; Dkt. No. 70.)  The Court would add only two points.

First, contrary to Plaintiff's argument that Defendant somehow misled D.A. Champagne by not disclosing to him the information contained in the Supporting Deposition of C.O. Bradish, it is an undisputed fact that D.A. Champagne based his decision to charge and ultimately prosecute Plaintiff on (in part or perhaps in its entirety) information told to him by Investigator Ritchie and/or Defendant, *which included discussions of "exactly" what was in C.O. Bradish's Supporting Deposition*.  (*See, supra,* Part I.C. of this Decision and Order.)

Second, while the following fact is by no means determinative, it is worth noting that the conclusion that probable cause existed to prosecute Plaintiff was reached by, *inter alia*, A.D.A. Delehanty, who correctly distinguished between the quantum of evidence needed for probable cause to prosecute and the quantum of evidence needed for a conviction at trial.  (Dkt. No. 70, Attach. 3, at 30, 32, 54, 61, 63 [attaching pages "30," "32," "54," "61" and "63" of Delehanty Dep. Tr.]; Dkt. No. 53, Attach. 6, at ¶¶ 22-24 [Delehanty Decl.].)  It is also worth noting that A.D.A. Delehanty attributed his loss at trial to the abrupt decision of his key witness (C.O. Bradish) to render trial testimony different from his previous written statements.  (*See, e.g.*, Dkt. No. 70, Attach. 3, at 16-17[attaching pages "16" and "17" of Delehanty Dep. Tr.].)

For all of these reasons, Plaintiff's malicious prosecution claim against Defendant is dismissed. Because the Court has found sufficient grounds on which to base its dismissal of Plaintiff's claims against Defendant, the Court need not, and does not, reach Defendant's alternative basis for dismissal, i.e., the doctrine of qualified immunity.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 53) is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

Dated: September 27, 2013
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge